**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**MAHMOUD AL HAFYAN,**<br>**AKA ABU ABDO AL-HOMSI,**<br><br>             **Defendant.** | Case: 1:20−mj−00162<br>Assigned To : Harvey, G. Michael<br>Assign. Date : 8/17/2020<br>Description: Complaint w/ Arrest Warrant |

**AFFADAVIT IN SUPPORT OF A**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Damien T. Tymes, being first duly sworn, hereby depose and state as follows:

**AFFIANT'S BACKGROUND**

1. This affidavit is submitted in support of a criminal complaint and application for an arrest warrant relating to MAHMOUD AL HAFYAN, a Syrian national last known to reside in Gaziantep, Turkey.

2. I am a Special Agent ("SA") with the United States Agency for International Development ("USAID") Office of Inspector General ("OIG") and have been since November 2018. Prior to working for USAID OIG, I was a Special Agent with the United States Air Force Office of Special Investigations ("AFOSI") from October 2005 to November 2018. I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia in December 2005. In both capacities, I have worked on terrorism matters and investigations relating to persons and organizations, including designated foreign terrorist organizations ("FTOs") who are interested in supporting terrorists.

3. In preparation for this assignment, and as part of your affiant's continuing education, I have successfully completed law enforcement and focused training, to include formal courses and training exercises related to procurement fraud, counterterrorism/counter-threat, and counterintelligence collections. I have participated in many aspects of federal investigations including, but not limited to: subject, victim and witness interviews, analysis of telephone and financial records, and assisting with the preparation and execution of arrest and/or search warrants. As a federal agent, I am authorized to investigate violations of the laws of the United States. As a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States. I have also investigated numerous procurement fraud cases, and am

familiar with the search, examination, and exploitation of information obtained from the internet, including cellular phone, computers, the internet, electronic mail, on-line messaging applications, and metadata associated therewith.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of your affiant's knowledge about this matter.

5. As set forth further herein, I respectfully submit that there is probable cause to believe that the above-identified individual has committed the following offenses in violation of United States law: (a) Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371; and multiple counts of (b) Theft Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. § 666(a)(1)(A).

## STATUTORY PROVISIONS

6. Title 18, United States Code, Section 371 makes it unlawful to conspire to commit any offense against the United States, or any agency thereof, in any manner or for any purpose, where one or more of such persons do any act to effect the object of the conspiracy.

7. Title 18, United States Code, Section 666(a)(1)(A) makes it unlawful for an agent of an organization to embezzle, steal, obtain by fraud, or otherwise without authority knowingly convert to the use of any person other than the rightful owner property that is valued at $5,000 or more, and is owned by, or is under the care, custody, or control of such organization, provided such organization receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

## FACTS SUPPORTING PROBABLE CAUSE

**Introduction and Background on Al-Nusrah Front**

8. The Syrian Arab Republic ("Syria") has been involved in a civil war since 2011. The war resulted in a humanitarian crisis, and the U.S. government has spent more than $9.1 billion on humanitarian assistance to conflict-affected Syrians. As described further herein, in Idlib, Syria, between 2014 and 2018, at least between $9.3-10.1 million of that U.S.-funded humanitarian aid was illegally diverted to armed combatant groups, including to the designated terrorist organization known as the Al-Nusrah Front ("ANF").

9. ANF was a terrorist organization based in Syria, which was most directly an extension of al-Qaida in Iraq ("AQI"), itself a terrorist organization based in Iraq. "al Qa'ida" was an Arabic word that loosely translates as "the Base" and "Al-Nusrah" was an Arabic word that loosely translates as "the Support." Veterans of AQI crossed the

border into Syria to join the fighting there and re-organized themselves as ANF. ANF used terrorist tactics, such as suicide bombings. ANF's primary objective was the overthrow of the secularist regime of President Bashar al Assad. ANF portrayed itself as part of the legitimate Syrian opposition to the al Assad regime, while it was, in fact, an attempt to exploit the instability in that country for its own purposes, to include establishing a fundamentalist Islamic state in Syria that could serve as a safe haven for terrorists. It was known within Syria that ANF committed numerous humanitarian atrocities in Syria during the Syrian civil war, to include mass executions of civilians, bombings, and kidnappings, and ANF publicly admitted to the same such conduct.

10. On December 11, 2012, the United States Secretary of State amended its prior designation of al Qa'ida as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (INA), and as a Specially Designated Global Terrorist ("SDGT") under section 1(b) of Executive Order 13224, to include ANF as an alias. The finding in support of amending the AQI designation was that ANF had committed hundreds of terrorist attacks in an attempt to hijack the struggles of the Syrian people for its own malign purposes. On May 15, 2014, in response to the evolving nature of the relationships between ANF and AQI, the Secretary of State separately designated ANF as an FTO and SDGT. During the time relevant to this Complaint, ANF was also known by the following aliases: Jabhat al-Nusrah; Jabhet al-Nusra; The Victory Front; Al-Nusrah Front for the People of the Levant; Al-Nusrah Front in Lebanon; Support Front for the People of the Levant; Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihadb; Jabhat Fath al Sham; Jabhat Fath al-Sham; Jabhat Fatah al-Sham; Jabhat Fateh al-Sham; Fatah al-Sham Front; Fateh Al-Sham Front; Conquest of the Levant Front; The Front for liberation of al Sham; Front for the Conquest of Syria/the Levant; Front for the Liberation of the Levant; Front for the Conquest of Syria; Hay'at Tahrir al-Sham; Hay'et Tahrir al-Sham; Hayat Tahrir al-Sham; Hay'at Tahrir al-Sham; Assembly for the Liberation of Syria; Assembly for Liberation of the Levant; Liberation of al-Sham Commission; Liberation of the Levant Organisation;, Tahrir al-Sham; and Tahrir al-Sham Hay'at. To date, ANF remains a designated FTO and SDGT.

11. During the time relevant to this Complaint, ANF also operated through subunits or affiliates, including Jund al-Aqsa ("JAA"), a terrorist group in northern Syria that primarily operated in Idlib and Hama provinces.

12. In January 2017, the ANF announced that it had merged with four smaller Islamist factions to form Hay'at Tahrir al-Sham (HTS). HTS was a vehicle to advance the ANF's position in the Syrian uprising and to further its own goals.

13. As used in this Complaint, ANF refers to Al Nusra-Front and all its aliases and affiliates.

**USAID and Humanitarian Relief in Syria**

14. The United States Agency for International Development ("USAID") was an independent federal government agency that received foreign policy guidance from the

Secretary of State. USAID was the principal U.S. federal agency that extended assistance to countries recovering from disaster, trying to escape poverty, and engaging in democratic reforms. USAID worked to support long-term and equitable economic growth and advance the United States' foreign policy objectives by supporting economic growth, agricultural development, global health, conflict prevention, and development relief. To perform its functions, USAID worked in close partnership with private voluntary organizations, indigenous organizations, universities, American and foreign businesses, international agencies, other governments, and other U.S. government agencies. USAID's headquarters was located in Washington, D.C.

15. Since 2012, USAID provided cross-border humanitarian assistance to Syrian internally displaced persons and other conflict-affected Syrians, including food, non-food items, and medical supplies. USAID spent over $4.6 billion on humanitarian assistance programs. These programs were contracted to various U.S. and international non-governmental organizations ("NGOs"), which were based in countries neighboring Syria, including Turkey and Jordan, and were responsible for delivering the U.S.-funded aid to the conflict-affected Syrians.

16. USAID's Office of Foreign Disaster Assistance (OFDA) and Office of Food for Peace (FFP) identified geographic and humanitarian needs, and broadly managed and oversaw the NGOs' implementation of the USAID programs. OFDA-related programs for northern Syria included the procurement and delivery of hygiene kits, blankets, kitchen sets, winter clothing, mattresses, and school supplies for children (generally "non-food item kits") to conflict-affected Syrians. FFP-related programs for northern Syria included the procurement and delivery of food kits, food vouchers, and flour for distribution (generally "food kits") to conflict-affected Syrians.

17. NGO-1 is an American non-profit, NGO based in Maryland. An NGO is a nonprofit organization independent of governments and international governmental organizations, although funded by governments, which aims to improve the lives of other people through humanitarian services, among other things.

18. In any one-year period relevant to this Complaint, NGO-1 received benefits in excess of $10,000 under a U.S. Federal program involving a grant, contract, subsidy, guarantee, or other form of assistance. Specifically, NGO-1 received humanitarian foreign aid grant money from USAID, through the aforementioned programs run by OFDA and FFP. The USAID awards to NGO-1 were to promote the well-being of conflict-affected Syrians. For example, the funds were used to procure non-food item kits and food kits, among other things, for conflict-affected Syrian persons. For the period of on or about July 30, 2014, through on or about August 31, 2018, USAID awarded NGO-1 six cooperative agreements totaling $119,897,431 ("the USAID awards"), as follows:

4

|    | Award Number | Duration | Amount |
|----|--------------|----------|--------|
| a. | AID-OFDA-A-13-00003-02 | 7/30/14-10/29/15 | $9,197,692 |
| b. | AID-OFDA-A-15-00041 | 9/1/15-11/30/16 | $8,162,631 |
| c. | AID-OFDA-A-16-00021 | 9/1/16-11/30/17 | $9,601,719 |
| d. | AID-OFDA-A-17-00057 | 8/15/17-11/14/18 | $7,178,719 |
| e. | AID-OFDA-A-17-00057 | 8/15/17-11/14/18 | $37,454,504 |
| f. | AID-FFP-G-15-00020 | 2/13/15-10/31/17 | $48,242,166 |

19. Under the USAID awards, NGO-1 procured non-food items and food from local vendors in Turkey, arranged them into the non-food item kits and food kits, and transported the kits to Syria for distribution to conflict-affected Syrians. The kits were property owned by or under the care, custody, or control of NGO-1.

20. With USAID, NGO-1 identified certain guidelines to determine which conflict-affected Syrians were eligible for kits, including Syrians who had women or children as head of household, chronic disease affliction, displacement within the last six months, and low income level (hereinafter "beneficiaries"). Based on these guidelines, NGO-1 created a list of the beneficiaries to whom its staff in Syria was supposed to distribute the kits. For instance, under the guidelines set by USAID and NGO-1, beneficiaries were to receive food kits based on their family size, *i.e.*, households with 1-3 family members were to receive 1 food kit, households with 4-7 persons were to receive 2 kits, and households with more than 7 members were to receive 3 kits. Similar guidelines existed for non-food item kits.

21. Under these guidelines, beneficiaries were required to sign their names on a beneficiary log each time they received a kit from NGO-1. These beneficiary logs were then sent from Syria to NGO-1's regional headquarters in Turkey in order to substantiate the distribution to conflict-affected Syrians, in accordance with USAID's requirements.

22. NGO-1 had various fraud prevention mechanisms in place. Specifically, NGO-1 instructed its employees to report any fraud in the distribution program to its regional headquarters in Turkey. Further, NGO-1 had an internal documentation system through which fraud concerns could be documented by NGO-1's employees and elevated to management at NGO-1. NGO-1 also had a hotline phone number available to its employees through which they could report fraud or abuse. Due to the remote location of NGO-1's staff in Syria, many Syrian-based NGO-1 employees were unable to utilize these fraud prevention mechanisms.

**Conspirators**

23. The Defendant, MAHMOUD AL HAFYAN, also known as Abu Abdo Al-Homsi, was a Syrian national last known to reside in Gaziantep, Turkey. AL HAFYAN had no known residence in any particular state or district of the United States. Relevant to this

5

Complaint, AL HAFYAN was an agent of NGO-1 authorized to act on NGO-1's behalf. Specifically, AL HAFYAN was the head of NGO-1's regional office in Syria, where he managed approximately 160 employees of NGO-1.

24. Coconspirator 1 was a Syrian national. Coconspirator 1 was an employee of NGO-1 located at its regional office in Syria. Coconspirator 1 was the Food Security Field Coordinator and was responsible for maintaining NGO-1's warehouse at that office. In this role, Coconspirator 1 directly managed several other employees of NGO-1, all of whom were involved in distribution of kits from NGO-1's warehouse. Coconspirator 1 reported directly to AL HAFYAN.

25. Coconspirator 2 was a Syrian national. Coconspirator 2 was an employee of NGO-1 located at its regional office in Syria. Coconspirator 2 was the logistics coordinator at NGO-1's warehouse at NGO-1's regional office. In this role, Coconspirator 2 oversaw the provision of kits from the warehouse to the teams of employees who delivered the kits to the Syrian beneficiaries. Coconspirator 2 reported directly to Coconspirator 1. Coconspirator 2 was a relative of AL HAFYAN.

## Witnesses

26. Witness 1 was an employee of NGO-1, located at its regional office in Syria. Witness 1 reported directly to AL HAFYAN. Witness 1 observed AL HAFYAN on a regular basis over approximately a three-year period, as well as Coconspirator 1, Coconspirator 2, and other employees of NGO-1. Witness 1 reported concerns about AL HAFYAN's conduct to NGO-1's staff in Turkey.

27. Witness 2 was an employee of NGO-1, located at its regional office in Syria. Witness 2 reported directly to Coconspirator 1, and thus also to AL HAFYAN. Witness 2 observed AL HAFYAN, Coconspirator 1, Coconspirator 2, and other employees of NGO-1 over approximately a three-year period. Witness 2 had direct knowledge of NGO-1's distribution of kits between July 30, 2014, and February 16, 2018.

28. It is my opinion that the information provided by Witness 1 and Witness 2, as described further herein, including their identifications of AL HAFYAN, Coconspirator 1, and Coconspirator 2 are credible. This opinion is based on several factors. I have personally interviewed Witness 1 and Witness 2, and both appeared to be providing information truthfully and voluntarily. Much of what Witness 1 and Witness 2 stated about AL HAFYAN's actions has been independently corroborated by other evidence, including other witnesses who worked for NGO-1, video evidence, NGO-1's beneficiary logs, and evidence on AL HAFYAN's phone. To the best of my knowledge and belief, Witness 1 and Witness 2 have never intentionally provided any material false or misleading information to me or any other law enforcement authorities during the course of this investigation. Additionally, Witness 1 and Witness 2 are willing to continue cooperating with the United States and to testify in the United States, if necessary.

**The Conspiracy**

29. Based on information I received during my investigation, I have concluded that there is probable cause to believe that from on or about July 30, 2014, through on or about February 16, 2018, defendant AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, in an offense begun and committed in Syria, and elsewhere outside the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States, knowingly combined, conspired, confederated, and agreed together and with each other to commit a crime against the United States and its agency, USAID, to wit, to embezzle, steal, obtain by fraud, or otherwise without authority knowingly convert to the use of another property that was owned by, or was under the care, custody, or control of, NGO-1, an organization receiving benefits from USAID pursuant to a Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance.

30. It was part and an object of the conspiracy that AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, did knowingly provide and attempt to provide property in the form of non-food item kits and food kits funded by USAID and obtained from NGO-1 to ANF, a designated foreign terrorist organization, and other armed combatant groups, which were not eligible to receive the property.

31. According to Witness 1 and Witness 2, as well as other witnesses I have interviewed during the course of the investigation with first-hand knowledge of the events, the conspiracy was effected in and by the following manners and means, among others:

    a. AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, reduced the number of non-food item kits and food kits that NGO-1 instructed its staff to distribute to conflict-affected Syrians, so as to create a surplus of items in NGO-1's Syrian regional office. Specifically, AL HAFYAN and Coconspirator 1 instructed NGO-1's employees to reduce the number of kits provided to the beneficiaries. Coconspirator 2 oversaw the provision of kits to the teams of NGO-1's employees responsible for distribution of the kits to Syrian beneficiaries. Coconspirator 2 was observed providing less kits than required to comply with NGO-1's distribution plan. As a result of this scheme, NGO-1's employees, including Witness 1 and Witness 2, observed a surplus of kits available in NGO-1's Syrian regional office's warehouse.

    b. AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, distributed the surplus kits to members of ANF, its affiliates, and other armed combatant groups operating in the Idlib, Syria, area. Specifically, Coconspirator 1 told Witness 2 that the excess kits needed to go to ANF, and that AL HAFYAN would also receive a portion of the excess kits. Coconspirator 2 told Witness 1 that certain truckloads of kits were excluded from distribution, and that Witness 1 should stay away from those truckloads. Witness 1 and Witness 2 observed fighters from ANF and other armed combatant groups come to NGO-1's regional office and obtain the surplus kits

  from NGO-1's employees at the warehouse. Some of the fighters were armed and bearing the flags associated with ANF and other armed combatant groups. Coconspirator 1 controlled access to the warehouse and, according to NGO-1's employees, had full knowledge of distributions from the warehouse.

 c. AL HAFYAN communicated with commanders from ANF and other armed combatant groups, and personally authorized the diversion of kits to fighters from ANF and other armed combatant groups. AL HAFYAN personally ordered Witness 2 to provide kits to fighters from ANF and other armed combatant groups, including Individual 1. Individual 1 was identified as the security commander for ANF by both Witness 1 and Witness 2.

 d. AL HAFYAN threatened NGO-1's employees with reprisal from commanders of ANF and other armed combatant groups if the employees did not go along with this scheme. Specifically, Witness 1 heard AL HAFYAN threaten that Individual 1, the security commander for ANF, would be told about NGO-1 employees who failed to follow AL HAFYAN's orders.

 e. Under directions from AL HAFYAN and others known and unknown, NGO-1's staff in Syria created falsified beneficiary logs, which did not include the names of fighters associated with ANF and other armed combatant groups who received kits. On these falsified beneficiary logs, NGO-1's staff forged the names of the intended beneficiaries to attest that the beneficiaries in the log had received the amount of kits required by NGO-1. Witness 1 personally observed the forgery of these logs. The falsified beneficiary logs were sent from NGO-1's regional office in Syria to its office in Turkey, as alleged evidence that the intended beneficiaries received the correct amount of kits to which they were entitled under the distribution guidelines.

 f. AL HAFYAN ordered NGO-1's staff to falsify their reports to NGO-1's supervisors at the regional office in Turkey. AL HAFYAN ordered NGO-1's staff in Syria not to report any of the aforementioned diversion conduct to NGO-1's regional office in Turkey. At staff meetings attended by Witness 1, Witness 2, and other employees, AL HAFYAN threatened NGO-1's staff that, if they reported the aforementioned diversion conduct to supervisors at the regional office in Turkey, they would be fired or harmed. Additionally, members of NGO-1's staff who voiced concerns about the scheme to AL HAFYAN were subsequently threatened by commanders of ANF and other armed combatant groups.

 g. Additionally, at staff meetings attended by Witness 1, AL HAFYAN ordered members of NGO-1's staff to donate portions of their salaries to ANF to support ANF's activities.

32. According to Witness 1 and Witness 2, as well as other witnesses I have interviewed during the course of the investigation with first-hand knowledge of the events, AL HAFYAN financially benefitted from the scheme and his relationship with ANF and

8

other armed combatant groups. Coconspirator 1 made statements to the witnesses that AL HAFYAN received a share of the surplus kits. Witness 1 and Witness 2 observed that AL HAFYAN lived a life in excess of what his salary from NGO-1 could afford, including building a new home that was more grand than typically affordable for someone of his economic status. Additionally, AL HAFYAN displayed loyalty to ANF, as well as other armed combatant groups. AL HAFYAN associated with members of ANF and other armed combatant groups. In staff meetings attended by Witness 1, Witness 2, and other NGO-1 employees, AL HAFYAN referred to ANF and other armed combatant groups as "mujahedeen," meaning they were freedom fighters who protected Syria with honor. AL HAFYAN stated that supporting jihadists was more important than providing aid to conflict-affected Syrians. AL HAFYAN stated that he would support ANF "no matter what."

33. As part of my investigation, I reviewed the report of a third-party monitor, which was hired by USAID to conduct a survey of beneficiaries in one of the villages serviced by NGO-1. The third-party monitor interviewed numerous beneficiaries and determined that they were given a number of kits below that to which they were entitled under NGO-1's distribution plan. The beneficiaries were not aware of the true number of kits they were entitled to receive.

34. As part of my investigation, I reviewed the contents of AL HAFYAN's cellular telephone, which further showed AL HAFYAN's connection to ANF and other armed combatant groups. Listed in the contact list of the cellular phone was the name of Individual 2. Next to the name of Individual 2 on the contact list entry were the words "Al Nusra Front."

35. As part of my investigation, I reviewed a Microsoft Excel spreadsheet saved on AL HAFYAN's cellular telephone. The spreadsheet lists names of individuals and the "number of kits" distributed to each on specific dates ranging from September 2017 to January 2018. Included on this list were:

   a. Individual 1, identified as the security coordinator for ANF, who received 6,843 food kits and 12,750 bags of flour between September 2017 and January 2018.

   b. Individual 2, identified as a commander for ANF, who received 200 food kits from September 25, 2017, to December 9, 2017.

   c. Coconspirator 1, 315 food kits from September 27, 2017, to December 12, 2017.

36. As part of my investigation, I reviewed translations of voice memorandum audio files on AL HAFYAN's cellular telephone. The voice memorandums were recorded by AL HAFYAN and his associates in approximately February 2018, around the time that NGO-1 was investigating the diversion of kits. Based on my training and experience, I know that individuals in Syria often send voice memorandums back and forth to each other as a method of having a phone conversation, due to the inconsistent cellular

service in parts of Syria. In certain voice memorandums, AL HAFYAN repeatedly discusses kits being provided to ANF fighters.

37. As part of my investigation, I reviewed various documents found on AL HAFYAN's cellular telephone, in which the author of the document purports to pledge their allegiance to ANF. Based on my training and experience, I know that individuals often sign such documents in order to prove loyalty to the organization and gain access to the organization's benefits, which here would include the distribution of kits. AL HAFYAN had approximately seven such documents saved on his cellular phone.

38. As part of my investigation, I reviewed the beneficiary logs sent from NGO-1's office in Idlib, Syria, to its office in Turkey, which purported to document the distribution of kits to beneficiaries in four villages in 2015. Approximately 20 boxes of beneficiary logs, containing thousands of pages relating to hundreds of beneficiaries, were forensically analyzed by a handwriting expert. The expert, after reviewing the signatures of purported beneficiaries over an eight or nine month period, opined that the signatures of the beneficiaries were inconsistent from month to month and were not signed by the same person, and thus evidence that the logs were forged. Additionally, I reviewed video that appeared to show NGO-1's staff forging the beneficiary logs by taking turns signing fake signatures on various pages of a log.

39. Based on the above evidence, USAID and NGO-1 estimated the number of kits that were diverted from the intended beneficiaries to ANF and other armed combatant groups. USAID concluded that approximately 380,000 kits had been diverted. The value of each kit varies based on the type of kit, but is typically approximately $25 per kit. Based on these figures, USAID and NGO-1 calculated that the estimated loss was between approximately $9.3-10.1 million of U.S.-funded aid being diverted away from the intended beneficiaries, conflict-affected Syrians, to ANF, other armed combatant groups, and themselves during the period of on or about July 30, 2014, through on or about February 16, 2018.

40. As part of my investigation, I reviewed a consensual statement given by AL HAFYAN to investigators from USAID. Among other things, in that statement, AL HAFYAN claimed that he permitted diversion to the armed combatant groups for the "safety" of NGO-1's employees. AL HAFYAN stated that, in 2017, ANF demanded access to the food kits and he resisted their demands. AL HAFYAN stated that he was later (in July 2017) kidnapped by individuals he believed to be affiliate with ANF who demanded a portion of the aid. Based on other information I received during my investigation, I have reason to doubt the truthfulness of AL HAFYAN's statement. First, the evidence of diversion pre-dates AL HAFYAN's alleged kidnapping by several years. Second, NGO-1's employees, including Witness 1 and Witness 2, all stated that they believed that the alleged kidnapping was a stunt to scare NGO-1's employees because AL HAFYAN was not harmed and was released after a short time, both of which were unusual for kidnappings perpetrated by ANF in northern Syria.

41. Based on information I received during my investigation, AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, perpetuated the above scheme and

converted the kits to the use of ANF, other armed combatant groups, and themselves without authority or consent of NGO-1.

## **CONCLUSION**

42. There is probable cause to believe that between on or about July 30, 2014, and on or about February 16, 2018, in an offense begun and committed in Syria, and elsewhere outside the jurisdiction of any particular state or district of the United States but within the extraterritorial jurisdiction of the United States, AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, conspired to commit a crime against the United States and its agency, USAID, the object of which was to divert from the intended beneficiaries (conflict-affected Syrians) non-food item kits and food kits obtained by NGO-1 using funding from the United States, to the ANF and other armed combatant groups.

43. There is probable cause to believe that between on or about July 30, 2014, through on or about February 16, 2018, in multiple offenses begun and committed in Syria, and elsewhere outside the jurisdiction of any particular state or district of the United States but within the extraterritorial jurisdiction of the United States, AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown, being an agent(s) of NGO-1, an organization receiving in any one year period between on or about July 30, 2014, and on or about February 16, 2018, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance—that is, the USAID awards—embezzled, stole, obtained by fraud, and otherwise without authority knowingly converted to the use of any person other than the rightful owner, and intentionally misapplied, property valued at more than $5,000 owned by and under the care, custody, and control of NGO-1— that is, without authority, AL HAFYAN, Coconspirator 1, Coconspirator 2, and others known and unknown diverted non-food item kits and food kits obtained by NGO-1 from the kits' intended beneficiaries, Syrian-conflict affected persons, to the ANF, other armed combatant groups, and themselves.

Based on the facts set forth herein, and on my training and experience in investigating cases involving violations of federal law, and on the information provided by other experienced agents with whom I have consulted, I submit that there is probable cause to believe that AL HAFYAN has committed the following offenses: (1) conspiracy to commit a crime against the United States; and (2) theft concerning programs receiving federal funds.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Damien Tymes
Digitally signed by Damien Tymes
Date: 2020.08.17 10:08:40 -07'00'

Damien T. Tymes
Special Agent
USAID Office of Inspector General

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 19th day of August, 2020.

_____
The Honorable G. Michael Harvey
United States Magistrate Judge